In Re Xerox Corporation Consolidated Shareholder Litigation


650766/18

Class Plaintiffs were represented by Richard T. Marooney, Jr., Robert Meadows and Israel Dahan, King & Spalding, 1185 Avenue of the Americas, New York, NY 10036 (212) 556-2100 rmarooney&commat;kslaw.com; Abraham Alexander of Bernstein Litowitz Berger & Grossman LLP, 1251 Avenue of the Americas, New York, NY 10020 (212) 554-1346 abe.alexander&commat;blblaw.com and James J. Sabella, Grant & Eisenhofer P.A., 485 Lexington Avenue, New York, NY 10017 (646) 722-8520 jsabella&commat;gelaw.com.
Defendant Fujifilm was represented by James E. Hough and Erik J. Olson of Morrison & Foerster, 250 West 55th Street, New York, New York 10019 (212) 468-8000 jhough&commat;mofo.com.
Defendant Xerox was represented by Jay Cohen, Jaren Elizabeth Janghorbani and Daniel J. Toal of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019 (212) 373-3000 jaycohen&commat;paulweiss.com.


Barry R. Ostrager, J.

This case involves a transaction approved by the Xerox Corp. ("Xerox") Board of Directors (the "Board") on January 31, 2018 pursuant to which Fujifilm Holdings Corp. ("Fuji") will acquire a 50.1% controlling interest in Xerox. Fuji and Xerox have long been involved in a complex, interlocking joint venture called Fuji Xerox Ltd ("Fuji Xerox") that distributes Xerox products in Asia and the Pacific Rim, including Australia and New Zealand. At present, Fuji has a 75% interest in the joint venture and Xerox has a 25% interest in the joint venture. The specific terms of the transaction, which requires shareholder approval, would be accomplished in the following manner:
1. Fuji Xerox will take a loan to finance the repurchase of Fuji's 75% share of Fuji Xerox for 671 billion yen. Once Fuji's 75% share is bought out, Fuji Xerox would become a wholly-owned subsidiary of Xerox.
2. Thereafter, pursuant to the transaction documents, Xerox will issue new shares of common stock to Fuji that will represent 50.1% of the fully diluted capital stock of Xerox after such issuance. The transaction documents set the aggregate purchase price of the shares at $6.1 billion, which is equivalent to the 671 billion yen Fuji will receive for its 75% of the joint venture. The $6.1 billion would be used to repay to Xerox the loan that [*2]finances the acquisition of the purchase of Fuji's 75% interest in the joint venture.
3. Finally, before the transaction closes, Xerox will borrow $2.5 billion to pay its shareholders a special dividend of $2.5 billion.
Other provisions of the transaction documents include a non-solicitation clause that prevents Xerox from soliciting other purchasers of Xerox as well as a fiduciary-out provision that would enable the Xerox Board to consider a potential unsolicited superior proposal. In addition, Fuji receives a six-day match right against any unsolicited superior proposal and, in the event the transaction does not close, Fuji would receive a $183 million break-up fee. Significantly, the transaction documents provide that after the closing the CEO of Xerox, Jeff Jacobson ("Jacobson"), will be the CEO of the combined company and that five of the existing Xerox directors (and Mr. Jacobson) will be members of the twelve-person Board of Directors of the combined entity. The five current Xerox directors who are chosen to be on the Board of the combined entity are assured of remaining directorships of the combined entity for five years.
There are pending motions for a preliminary injunction enjoining the transaction filed by Darwin Deason ("Deason"), the third largest shareholder of Xerox who claims to have a $600 million investment in Xerox, and by certain pension funds that hold Xerox shares that have filed a consolidated class action against the defendants.[FN1]
Deason also seeks a mandatory injunction requiring the Xerox Board to waive the advance notice bylaw that would have required Deason [*3]to propose on or before December 11, 2017 a slate of directors for election at the Xerox annual shareholders' meeting to run against the incumbent director slate. The "class" plaintiffs also seek an injunction adjourning the shareholder vote on the transaction to a date after the Xerox annual shareholder meeting. 
Xerox's largest shareholder, Carl Icahn ("Icahn"), made a timely filing of a slate of four directors challenging the four longest serving members of the Xerox Board of Directors. Xerox's current Board is presently composed of nine highly credentialed and experienced directors and Mr. Jacobson. Prior to filing his slate of directors, Icahn requested that Xerox extend the advance notice bylaw, which request the Board denied. On December 12, 2017, Icahn released an open letter to Xerox shareholders championing his slate of directors and criticizing the long-tenured directors of Xerox, one of whom is Xerox Chairman Robert Keegan ("Keegan"). In January 2018, after the existence of the Fuji Xerox combination was publicly reported, Mr. Deason wrote a January 22, 2018 letter to the Xerox Board demanding public disclosure of the joint venture arrangements. Mr. Deason is now supporting Mr. Icahn's slate of four directors, and Mr. Icahn is sharing with Mr. Deason the costs of prosecuting this litigation.
For the reasons that follow, all three motions for a preliminary injunction are granted on the basis of the testimony adduced at the two-day evidentiary hearing that took place on April 26 and 27, 2018; the applicable law; and the voluminous submissions made by the parties in connection with the motions. During the evidentiary hearing, testimony was adduced from eight live witnesses who testified in person and four witnesses who testified by videotaped deposition.
Findings of Fact
It is undisputed that the joint venture agreement between Fuji and Xerox, which has been renewed multiple times for five-year terms over decades and which next expires in April 2021, contains various provisions that make it difficult, but not impossible, for Xerox to engage in any value-maximizing transaction with any party other than Fuji. Among the terms of the joint venture agreement are provisions that prohibits Xerox from selling more than 30 percent of its outstanding shares to a Fuji competitor without triggering a variety of adverse economic consequences to Xerox, including the cancellation of the joint venture and loss of the technology that Xerox has contributed to the joint venture over many decades. The provision in the joint venture agreement relating to the sale by Xerox of more than 30 percent of its stock to a Fuji competitor was first disclosed to Xerox shareholders and the public when the transaction was announced on January 31, 2018. 
The Fuji Xerox joint venture accounts for approximately 25 percent of Xerox's revenues. In April 2017, there was an accounting scandal involving Fuji Xerox that caused Xerox to have to revise its earnings for 2017 and several years prior to 2017. All issues relating to the accounting scandal were not resolved at the time the Xerox Board approved the transaction, and a final audit of Fuji Xerox for 2017 that was received by Xerox on April 24, 2018 will cause Xerox to revise its earnings for the first quarter of 2018. The transaction documents required Fuji to deliver the audited financial statement by April 15, 2018, so it appears that there may be further negotiations between Fuji and Xerox. There are conflicting Japanese law expert reports on the issue of whether, under Japanese law (which governs the joint venture agreements and the joint venture transactional documents), Xerox could have withdrawn from the joint venture agreements because of the accounting scandal. Finally, the weight of the evidence adduced at the hearing, including Xerox's financial performance in 2017, established that on and before January 31, 2018 there was no exigent necessity for Xerox to engage in any change of control [*4]transaction. The evidence also established that Mr. Icahn had a strong desire to have Xerox sold in an all-cash transaction at a premium over Xerox's market value.
The lynchpin of this Court's decision turns on the conduct of Xerox CEO Jeff Jacobson in the time frame preceding the Board's approval of a transaction that granted control of an iconic American company to Fuji without any cash payment by Fuji to Xerox shareholders, and the Board's acquiescence in Jacobson's conduct.
The testimony adduced at the hearing established that Fuji and Xerox had explored various potential transactions over a period of decades, including an outright purchase by Fuji of all Xerox shares. And, in early 2017, discussions relating to a purchase of all Xerox shares by Fuji were in process. 
On March 7, 2017, Jacobson went to Japan to meet with Shigetaka Komori ("Komori"), Fuji's Chairman and CEO, and Kenji Sukeno ("Sukeno"), Fuji's President and COO. (PX 18).[FN2]
According to Jacobson, during the meeting, Komori asked Jacobson whether Xerox would be interested in being acquired by Fuji. Komori and Sukeno explained that they believed a combination of Fuji, Xerox, and Fuji Xerox would provide the best value for both Fuji and Xerox shareholders and that Fuji understood that Xerox would likely require a 30 percent premium on its stock price. Id. The next day, Takashi Kawamura ("Kawamura"), Fuji's Head of Strategy, handed Jacobson a letter summarizing the parties' discussions and confirming Fuji's interest in acquiring Xerox. (PX 20). 
On March 16, 2017, the Xerox Board met to discuss Fuji's proposal and agreed to engage Centerview Partners ("Centerview") as a financial advisor. Centerview gave a presentation to the Xerox Board analyzing the economics of a possible all-cash acquisition by Fuji. (PX 24).
Following the Xerox Board meeting, Jacobson sent a formal written response to Fuji's March 8 letter. (PX 347). Jacobson advised Fuji that "[w]e would be prepared to enter into discussions only" if Fuji's offer reflects an "appropriate premium to our current trading price" and provides "our shareholders 100% cash consideration." Id. Thus, as reflected in Jacobson's March 16, 2017 communication to Fuji, as of at least March 16, 2017, the Board made clear to Fuji that Xerox was not in immediate or urgent need of a strategic combination and that it was only interested in pursuing an all-cash acquisition by Fuji. In short, the parameters of the change of control transaction under discussion in early 2017 were nothing like the terms to which the Xerox Board ultimately agreed to in January 2018.
Jacobson's role in negotiating the ultimate transaction must be viewed against the background of events that commenced on and after May 15, 2017 when Jacobson participated in a dinner with Carl Icahn at which Icahn told Jacobson, in the presence of two of Jacobson's direct reports, that Icahn did not believe Jacobson was the right person to be Xerox CEO and that Icahn wanted Xerox sold. Icahn further stated that Jacobson would be fired if Jacobson was unable to produce a sale transaction. Jacobson memorialized his recollection of his meeting with Icahn and shared it with the Xerox Board. (PX 50). In November 2016, Icahn had threatened a proxy contest which did not occur after Xerox and Icahn entered into a standstill agreement that had an outside expiration date of December 11, 2017. The agreement also made provision for the addition of Jonathan Christodoro ("Christodoro") to the Xerox Board as Icahn's [*5]representative with the ability to report to Icahn on issues before the Xerox Board. Christodoro ultimately resigned from the Xerox Board to be a member of Icahn's slate immediately prior to December 11, 2017.
Shortly after the dinner meeting with Icahn, on or about May 22, 2017, Jacobson and the Xerox Board were advised that Fuji could not advance strategic discussions with Xerox until the Fuji Xerox accounting scandal was resolved. Fuji, embroiled in the Fuji Xerox accounting scandal, which involved allegations of fraud, proposed to suspend discussions and indicated that a purchase of all Xerox shares was too expensive for Fuji. Thereafter, the testimony established that Jacobson, working with Xerox's investment banker, Centerview, developed a transaction concept that would allow Fuji to make a cashless acquisition of Xerox. 
Jacobson testified that he was authorized by Xerox Chairman Keegan to explore with Fuji alternatives to an all-cash deal, but the full Xerox Board was unaware of Jacobson's overture to Fuji which was presented to Fuji in June 2017. For all intents and purposes, Jacobson's cash-free acquisition concept took off the table any type of all-cash sale transaction with Fuji even though one of Xerox's financial advisors, David Hess of Centerview, testified that Fuji has cash reserves of $8 billion. And, while Fuji sought to delay a substantive meeting with respect to Jacobson's proposal, Jacobson insisted on pressing for a July 2017 meeting. It was only in July 2017 that Jacobson advised the full Xerox Board of his strategic acquisition proposal that could potentially transfer to Fuji control of Xerox.
During the late spring and early summer of 2017, Icahn and his Board nominee, Christodoro, were pressuring Jacobson and the Xerox Board to secure a transaction, and Jacobson believed Icahn would initiate a proxy contest to remove the Board. In July 2017, Icahn was informed of Jacobson's strategic acquisition concept, and Icahn advised Keegan that Icahn opposed a transaction that would leave Xerox shareholders with a 49.9% minority interest in a combined company controlled by Fuji. Icahn further requested that a search committee be formed to find a replacement for Jacobson. Keegan conceded at the hearing that he suggested to Jacobson that Jacobson propose to Fuji that Fuji purchase Icahn's shares in Xerox.
During the summer of 2017, while Jacobson was dialoguing with Fuji's most senior executives, the Xerox Board became disenchanted with Jacobson's performance as CEO and the Board decided that Jacobson was not the right person to lead Xerox into the future. Director Cheryl Krongard ("Krongard") testified that this was the unanimous view of the Board. Notes prepared by Keegan from April 2017 reflect that there was concern with Jacobson's performance as CEO as early as April 2017. In July 2017, the Board decided to form a committee called the "Scan Committee" to explore finding a potential replacement for Jacobson. Keegan testified that by September 2017 the Board had hired a professional search firm, Heidrick & Struggles ("Heidrick"), to identify potential candidates to replace Jacobson as CEO. (Keegan EBT, PX 236 at 188:18-23). The members of the Scan Committee were Directors Keegan, Reese, Brown and Christodoro. (Id. at 186:8-12). 
The Xerox Board interviewed various candidates in October and November 2017. The Board specifically identified as Jacobson's potential replacement, Giovanni (John) Visentin ("Visentin"), a former IBM and HP executive that Xerox's Chairman Keegan described as "head and shoulders" better than Jacobson. The Board discussed compensation terms with Visentin and identified a start date for Visentin of December 11, 2017. Jacobson testified that he was unaware of any efforts to replace him prior to November 10, although this testimony is suspect given the large number of people aware of the work of the Scan Committee.
On November 10, 2017 Keegan advised Jacobson that he might be replaced. Keegan further told Jacobson at the express and unanimous direction of the Xerox Board to desist from further discussions with Fuji about a possible combination of Xerox with Fuji and to cancel meetings in New York and Japan that were scheduled for November 14 and November 21, 2017. On November 12, 2017, Jacobson emailed to his personal email account copies of his employment agreement and pension plan. (PX 247). Jacobson and Keegan both testified that Keegan advised Jacobson that Xerox had reached no decision as of November 10 to replace Jacobson as CEO, but correspondence with the head of Fuji's corporate planning department, Takashi Kawamura, makes clear that Jacobson communicated his "situation" to Fuji. And Hess testified that both Keegan and Jacobson informed Hess about Jacobson's precarious circumstances. On November 13, Jacobson sent Hess a text message stating that wherever Jacobson landed, he would work with Hess again. (PX 299).
For its part, Fuji, intrigued by the possibility of acquiring control of Xerox without any cash payment to Xerox shareholders, became increasingly susceptible to Jacobson's concept of a cashless strategic acquisition of Xerox by Fuji. Kawamura prevailed upon Jacobson to proceed with the November 14 meeting and Jacobson, in turn, successfully prevailed upon Keegan to allow the meeting to proceed. Keegan permitted Jacobson to continue his discussions without notifying or seeking authorization from any member of the Xerox Board other than Ann Reese. After the November 14 meeting, Keegan authorized Jacobson to go to Japan on November 20 to meet with Fuji executives. At a meeting on November 21, after Jacobson had apparently discussed his "situation" with Kawamura, Jacobson explained to Komori that Xerox needed a term sheet by November 28, 2017. On November 21, 2017, Jacobson also sent Hess an email questioning whether Hess thought Jacobson would receive his "package" from Xerox before Thanksgiving. Prior to the November 21 meeting, Kawamura texted Jacobson as follows:
Welcome to Japan! Hope you had a good flight. I met Komori twice today. He made a lot of questions. He's looking forward to seeing you tomorrow. I have your discussion material today. He said he understands the contents and no need to spend much time on the presentation. He would focus on hearing current situation surrounding you and XC and what we can do. . . . But basically he's ready to send the term sheet unless anything unexpected happens tomorrow. . . . Because Komori is in the good mood now. Better not do anything which may make Komori feel uncomfortable (PX 301) (emphasis added).
Significantly, Jacobson texted Centerview's David Hess that Kawamura "told me that there is no deal without me." (PX 302).
Fuji provided a term sheet (the "Fuji Term Sheet") on November 30 reflecting its formal merger proposal. Consistent with Jacobson's July 2017 proposal, instead of an all-cash deal, Fuji offered a structured transaction in which it would end up owning a 50.1 percent controlling interest in Xerox. At no time prior to a January 24, 2018 teleconference between Keegan and Komori did any Xerox director participate in any meeting with Fuji executives; all such meetings involved Jacobson. The Fuji Term Sheet set January 31, 2018 as the target date for a definitive agreement. Fuji wanted to close the deal quickly so that it could announce it at the same time Xerox announced its fourth-quarter 2017 earnings.
In December 2017, the Xerox Board established a four-person Transaction Committee to discuss and monitor the ongoing negotiations. The Transaction Committee was composed of Keegan and other long-serving Xerox directors.
After the constitution of the Transaction Committee, the Transaction Committee requested that Fuji increase the dividend to Xerox shareholders from $2 billion to $2.5 billion, and made some additional non-monetary governance demands, including a demand that there not be co-CEO's as Fuji proposed, but only one CEO—Jacobson, the person the Xerox Board had unanimously agreed to potentially replace with an identified successor literally weeks earlier. Fuji, of course, was receptive to having Jacobson be the sole CEO as he was the person who had delivered cash-free control of Xerox to Fuji. And, as Komori testified, Jacobson was the only Xerox director known to Fuji. Director Krongard testified that the Board was told both by Centerview and Xerox's outside counsel that Jacobson had to be the CEO of the combined companies. The most benign explanation of Keegan's insistence that Jacobson be the CEO of the much larger combined company is, as Director Krongard testified, that the Xerox Board trusted Komori to replace Jacobson if Jacobson did not perform. The Court finds this rationale perplexing.
Notwithstanding testimony to the contrary from Jacobson and Keegan, it is simply counter-intuitive and not credible to the Court that Jacobson was not conflicted with respect to his dealings with Fuji on behalf of Xerox at least as of November 10, 2017. It is equally counter-intuitive and not credible to the Court that Jacobson did not both explain his personal circumstances to Fuji and attempt to enlist Fuji's assistance in preserving his position as the contemporaneous documents established. Indeed, in one text message to Jacobson, Kawamura states that he and Jacobson should "be the one team to fight against [their] mutual enemy" in reference to Icahn. (PX 297). Keegan and Reese, who, like Jacobson, owed a duty of loyalty to all Xerox shareholders, both saw this email. Jacobson responded to Kawamura stating: "We are aligned my friend." Id. By the same token, notwithstanding the quality and experience of Xerox's Board, it was a breach of fiduciary duty for Keegan to authorize Jacobson to continue to be the primary interface with Fuji after Keegan both told Jacobson he could be imminently terminated and, for that reason, he should cease communications with Fuji about any transaction.
On December 4, 2017, Centerview made a presentation to the Xerox Board. Among other issues, Centerview urged the Board to consider whether Fuji's proposal provided enough economic upside to compensate shareholders for ceding control. (PX 343). It also urged the Board to consider whether there were attractive and feasible strategic opportunities other than the Fuji structured transaction. Id. Thereafter, director Krongard expressed her extreme concern to Keegan about Jacobson's continuing role and blatant disregard of the Board's unanimous directive that he cease all further negotiations with Fuji. (PX 127). In a five-page hand-written letter to Keegan, Krongard stated, among other things, the following:
As one Director, I believe we are at, perhaps, the most defining moment of the company's future. To succeed, Xerox will need leadership and clarity of purpose. We know the right leadership is not there now. . . .
This Board exhausted every ounce of patience and coaching to make our current CEO a success. We then decided, unanimously, for a variety of reasons, he was not the leader we need. You and the "Scan" Committee conducted a very thorough talent review and have identified an individual you described to me as "head and shoulders better than Jeff." Jeff was told by you, as directed and supported by the Board, that the Board was disappointed by his performance and would likely look at outside talent. Additionally, you told him in no uncertain terms that he was to discontinue any and all conversations with FX and F regarding Juice [the transaction]. He blatantly violated a clear directive. [*6]Which brings us to where we find ourselves today. We have a rogue executive, together with an advisor(s) who only gets a big payday if there is a deal. . . .
Jeff has put us, and mostly you, in a horrible situation. He is asking us to lie! In my most heartfelt and emotional outreach to you, I implore you not to let this happen! Id. Krongard never received a response to this letter from Keegan, although she did learn that Keegan had authorized Jacobson to participate in the November 14 and November 21 meetings that advanced the Fuji discussions. On December 11, Fuji sent its "best and final offer" for the proposed transaction. Other than increasing the amount of Xerox's dividend to its shareholders — which was to be funded by a loan taken out by Xerox — Fuji did nothing to sweeten the deal. That same day, Jacobson texted Kawamura: "Tak, you will see on the internet, that Icahn has publicly called for Xerox to hire a new CEO. This is what we expected. We will finish our mission and win!". (PX 312). Kawamura responded "We are supporting you Jeff!" Id. The following day, Kawamura wrote to Jacobson:
"Jeff, I met Komori again today and explained Icahn situation. I said we must win with Jeff and he was energized. He's keen to know any developments surrounding Icahn. Please keep me updated." (PX 313). Jacobson responded to Kawamura: "Please thank Mr. Komori for me. I appreciate his support and loyalty!" Id. 
On January 16 and 17, 2018, senior Xerox executives and Centerview met in Tokyo with Fuji and Fuji's investment advisor, Morgan Stanley. Significantly, on January 17, 2018, Kawamura texted Jacobson that Komori was concentrating on the "new management and the board." (PX 325). Jacobson replied:
That is good. Are things on track as we discussed for you [sic] role and my role? Regards, Jeff. Id.
Kawamura:
I think so. But he did not mention the name . . . . I heard you gave him your idea about the continuing directors. Can you give me top five candidates? Id.
Jacobson:
It is important that Mr. Komori tell Bob Keegan what he wants. I told Mr. Komori this. I believe the directors who will want to continue (to be confirmed) are Keegan, Reese, Ruskowski, Prince, Tucker and Echevarria. Of the 6, there are 5 spots and all should be fine . . . . Do you think Sukeno will be able to persuade M[r]. Komori? Id.
Kawamura:
Thank you. I mean Sukeno is not as excited as Komori about this deal . . . . I clearly told Komori to tell Keegan that he wants Jeff to be the CEO. Id. (emphasis added). According to Fuji, it was necessary to keep Jacobson as CEO of Xerox, not because Fuji necessarily valued Jacobson's talent as a CEO, but rather, because Fuji, through Jacobson, could maintain complete control over the Xerox board. A Fuji internal memo states:
As the 12/11 deadline for submission of the shareholder's proposal approaches, there has been a recent drop in stock price. The director under Mr. [Icahn's] control was putting very strong pressure on CEO Jacobson and was trying to dismiss Mr. [Jacobson] from his position as CEO. Hypothetically, if Mr. [Jacobson] was dismissed, then the next [*7]CEO would be someone associated with Mr. [Icahn], resulting in [Fuji] losing control of the [Xerox] board of directors through association with Mr. [Jacobson]. (PX 107) (emphasis added).
Kawamura explained that the use of the word "control" was a short-hand way of explaining that Jacobson was the only director known to Fuji. But, it is clear from all the testimony that Fuji knew from Jacobson that without Jacobson the momentum for what Fuji considered to be a very attractive deal for Fuji would be lost.
On January 24, just a week before the deal was scheduled to be announced, David Hess of Centerview emailed Kawamura raising concerns that the "financial due diligence on [Fuji Xerox] is incomplete and requires more work and disclosure" and that "the current financial projections we have created together do not create enough value for [Xerox] shareholders." (PX 170). Given these concerns, Hess insisted that the "January 31 announcement is not possible." Id. Kawamura's response was that "Fujifilm will walk [a]way from this deal if you won't keep the announcement schedule." (PX 327).
On January 30, Centerview issued a fairness opinion on the transaction for which it was paid $10 million. Centerview will receive an additional $40 million only if the transaction is consummated.
The circumstance that the transaction that was ultimately approved by the Board transferred control of Xerox to Fuji without any payment to Xerox shareholders, with Jacobson as the CEO of the combined entity and privileged to opine to Komori on the five members of the Xerox Board who might be directors of the combined entity for five years, takes this transaction out of the realm of cases in which courts defer to the business judgment of independent directors. This transaction was largely negotiated by a massively conflicted CEO in breach of his fiduciary duties to further his self-interest and approved by a Board, more than half of whom were perpetuating themselves in office for five years without properly supervising Xerox's conflicted CEO. Indeed, Xerox director Krongard expressed herself in an email to Keegan:
"If you try to argue both sides of the transaction, I can argue strongly that we are not acting in our shareholders' best interest in this transaction. No premium, minority position, no governance and a base from the LRP [Long Range Plan] which comprises fictional numbers." [PX 120]
Ms. Krongard's reference to fictional numbers included the value of the supposed and unquestionably speculative synergies that the transaction would produce separate and apart from the cost savings built into Xerox's Long-Range Plan. The supposed value proposition of the transaction largely turned on the value of the synergies and the valuation of Fuji Xerox, both of which are highly subjective. 
The arresting irony of the transaction is the fact that while the transaction was rushed through to completion between November 2017 and January 31, 2018, there is scant evidence that Xerox had any exigent necessity to do any transaction on a timetable that would schedule the shareholder approval vote on the date of the Annual Meeting. And there is sparser evidence that Xerox came close to exhausting various alternative transactions with other parties that could have been more advantageous to Xerox. Indeed, Jacobson had learned in July 2017 that Fuji might be receptive to partnering with a private equity firm to acquire 100% of Xerox, but no effort was ever made to explore this option. Certainly, Fuji cannot be faulted to for taking advantage of the opportunity Jacobson presented Fuji which, in Komori's words, enabled Fuji to "take control of Xerox without spending a penny." [Amend. Compl. ¶ 274]. But, that does not [*8]mean Fuji did not aid and abet a breach of fiduciary duty.
Legal Standard
To obtain a preliminary injunction under CPLR § 6311, a plaintiff must demonstrate: (i) a likelihood of ultimate success on the merits; (ii) the prospect of irreparable injury in the absence of injunctive relief; and (iii) a balance of equities tipping in the moving party's favor. See Doe v. Axelrod, 73 NY2d 748, 750 (1988). 
Injunction of the Proposed Transaction
Class plaintiffs and plaintiff Deason (together, "plaintiffs") seek a preliminary injunction enjoining defendants from taking any further action to consummate the change of control transaction between Xerox and Fuji that is currently scheduled for a shareholder vote in June 2018. 
The plaintiffs have demonstrated a likelihood of success on the merits of their claim that defendants breached their fiduciary duties as directors in approving the proposed transaction and that Fuji aided and abetted such breach.[FN3]
For the same reasons as those stated in the following analysis of the merits of plaintiffs' breach of fiduciary duty claim—and in the analysis of plaintiff Deason's motion for an injunction waiving Xerox's advance notice bylaw deadline—plaintiffs have clearly established irreparable harm and a balance of equities in their favor. Therefore, both motions for a preliminary injunction are granted. 
"[I]n an action seeking to hold a director liable, a court must first determine whether the business judgment rule applies." Patrick v. Allen, 355 F. Supp. 2d 704, 711 (S.D.NY 2005). "It is black-letter, settled law that when a corporate director or officer has an interest in a decision, the business judgment rule does not apply." In re Croton River Club, Inc., 52 F.3d 41, 44 (2d Cir. 1995). No more evidence of a breach of fiduciary duty need be established than Keegan and Reese ignoring a memo characterizing Xerox's largest shareholder as the "common enemy" of Fuji and Xerox. 
"The elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." Varveris v. Zacharakos, 110 AD3d 1059, 1059 (2d Dep't 2013) (internal quotations omitted). "Members of a board of directors of a corporation 'owe a fiduciary responsibility to the shareholders in general and to individual shareholders in particular to treat all shareholders fairly and evenly.'" Deblinger v. Sani-Pine Prods. Co., Inc., 107 AD3d 659, 660 (2d Dep't 2013) (quoting Schwartz v. Marien, 37 NY2d 487, 491 (1975)). The business judgment rule will not shield a decision from judicial inquiry if it was the product of bad faith or self-dealing. Patrick, 355 F. Supp. 2d at 710.
The facts adduced at the evidentiary hearing clearly show that Jacobson, having been told on November 10 that the Board was actively seeking a new CEO to replace him, was hopelessly conflicted during his negotiation of a strategic acquisition transaction that would result in a combined entity of which he would be CEO. There is ample evidence that he collaborated with Fuji to make himself indispensable to the transaction. Therefore, "[w]hen a shareholder attacks a transaction in which the directors have an interest other than as directors of the corporation, the directors may not escape review of the merits of the transaction." Lewis v. S.L. & E., Inc., 629 [*9]F.2d 764, 769 (2d Cir. 1980). Once, the business judgment presumption is lost, defendants are required to demonstrate the "entire fairness" of the proposed transaction. See Alpert v. 28 Williams St. Corp., 63 NY2d 557, 570-71 (1984). As the testimony adduced at the hearing clearly established, once Jacobson learned that he had been targeted for replacement by Xerox's largest shareholder and eventually the Board itself, he abandoned the Board's request to obtain a value-maximizing all-cash transaction and engineered the framework for a one-sided deal that includes Jacobson retaining his position as CEO post-transaction. And, at all relevant times after his May 2017 dinner with Icahn, Jacobson was consistently acting without the knowledge of the entire Xerox Board even after the Board decided in November 2017 that he immediately cease any further communications and negotiations with Fuji about a possible transaction. Despite the Board's decision, Jacobson doubled down on his efforts and worked directly with Fuji to ensure a deal that is disproportionately favorable to Fuji, not Xerox. 
"The concept of entire fairness has two prongs: fair dealing and fair price. The fair dealing prong of the entire fairness inquiry relates to how a transaction is structured and negotiated. The fair price prong relates to the economic and financial considerations of a proposed merger. When making a determination of a transaction's entire fairness courts examine the transaction as a whole looking at both fair price and fair dealing, without focusing on one component over another." In re Viacom Inc. Shareholder Deriv. Litig., No. 602527/05, 2006 WL 6663987, at *7 (NY Sup. Ct. NY Co. June 23, 2006) (citation omitted); see T. Rowe Price Recovery Fund, L.P. v. Rubin, 770 A.2d 536, 553 (Del. Ch. 2000) ("The test of entire fairness is an exacting one and, where it applies, the 'challenged transaction must withstand rigorous judicial scrutiny.") (internal quotations omitted).
Plaintiffs have demonstrated a probability of success in establishing that the director defendants, a majority of whom would have future directorship positions on the board of the combined entity, acted in bad faith in structuring and negotiating the proposed transaction. According to Xerox's own financial advisor, Hess, the transaction undervalues Xerox, provides an inadequate control premium to shareholders, and provides Fuji with majority control over the combined entity. 
Plaintiffs have demonstrated that they will incur damage as a result of defendants' misconduct in the absence of injunctive relief, because shareholders will lose the potential opportunity to receive a superior control premium while being forced to vote on the proposed transaction despite Xerox's failure to make timely, material disclosures regarding the transaction and the Fuji Xerox joint venture. The facts adduced show that as of at least March 16, 2017, the Board made clear to Fuji that Xerox was not in immediate need of a strategic combination and that it was only interested in pursuing an all-cash acquisition with Fuji. 
Plaintiffs' additional claim that Fuji aided and abetted the director defendants' breach of fiduciary duty is also likely to succeed on the merits. "A claim for aiding and abetting fiduciary duty requires (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." Higgins v. New York Stock Exch., Inc., N.Y.S.2d 339, 364 (NY Sup. Ct. 2005) (internal quotations and citations omitted). "One who aids and abets a breach of fiduciary duty is liable for that breach as well, even if he or she had no independent fiduciary obligation to the allegedly injured party, if the alleged aider/abettor rendered 'substantial assistance' to the fiduciary in the course of effecting the alleged breaches of duty." Caprer v. Nussbaum, 36 AD3d 176, 193-94 (2d Dep't 2006) (citations omitted). Courts have found "knowing [*10]participation" where "the terms of the transaction are so egregious as to be inherently wrongful." Obeid v. Mack, No. 14-CV-6498, 2016 WL 5719779, at *5 (S.D.NY Sept. 30, 2016).
As discussed in great detail in the Court's factual findings, plaintiffs have demonstrated that throughout negotiations, Fuji's representatives Kawamura and Komori believed that the proposed transaction disproportionately favored Fuji at the expense of Xerox shareholders. (Komari: The transaction "enabled Fuji to take control of Xerox without spending a penny.") Fuji, knowing full well that Jacobson was under enormous pressure from Icahn and the Board and that Jacobson could soon be replaced as CEO, presented Jacobson with the opportunity to stay on as CEO of the combined entity that would emerge from a change of control transaction that deprived Xerox shareholders of an adequate control premium. The communications between Kawamura and Jacobson in particular, as discussed in the Court's findings of fact, demonstrate the significant degree to which the two were aligned in combating Icahn and the Board so that Fuji could consummate a deal entirely in its favor and so that Jacobson could maintain his position as CEO.
Injunction of Xerox's Advance Notice Bylaw Deadline
With respect to plaintiff Deason's motion for a mandatory injunction compelling Xerox to waive the advance notice bylaw to block Deason from fielding a slate of directors who would presumably object to a change of control transaction that was only disclosed to the shareholders after the advance notice had expired, the Court finds that the reasoning of Hubbard v. Hollywood Park Realty Enterprises, Inc., 1991 WL 3151, 17 Del. J. Corp. L. 238 (1992) is directly applicable to this case and Deason should be allowed to propose to the shareholders a slate of directors, provided he does so in the next 30 days. While shareholders can, admittedly, vote against the proposed change in control transaction, the proposed full proxy contest sought by Deason is a fair and logical way to provide Xerox shareholders with choices relating to the proposed transaction. A board other than the Board that approved this transaction might decide to pursue an all-cash acquisition or a deal with a company other than Fuji. It also might negotiate a better deal with Fuji, particularly since Xerox has to revise its first quarter earnings for 2018 as a result of Xerox's belated receipt of audited 2017 financials for Fuji Xerox. For these reasons, Deason's motion for mandatory injunction waiving the advance notice bylaw deadline to enable him to field a competing slate of director nominees is granted.
It is well-settled law that a shareholder is entitled to a waiver of a corporation's advance notice deadline for nominating directors when there is a material change in circumstances of the corporation after the nomination deadline. Certain material, post-deadline changes in business policy and direction may "foreseeably generate controversy and shareholder opposition. Under those circumstances, considerations of fairness and the fundamental importance of the shareholder franchise dictate[] that the shareholders be afforded a fair opportunity to nominate an opposing slate, thus imposing upon the board the duty to waive the advance notice requirement of the by-law." Hubbard v. Hollywood Park Realty Enterprises, Inc., Civ. No. 11779, 1991 WL 3151, at *12 (Del. Ch. Jan. 14, 1991); see Icahn Partners LP v. amylin Pharm., Inc., No. 7404-VCN, 2012 WL 1526814, at *3 (Del. Ch. Apr. 20, 2012) (granting mandatory injunction where plaintiffs alleged that after the advance notice bylaw deadline the board radically changed its outlook for the company). 
Here, and as discussed in more detail supra, the Xerox Board made several significant decisions regarding a change of control transaction with Fuji, as well as significant disclosures [*11]regarding the terms of the Fuji Xerox joint venture, six weeks after the director nomination deadline in Xerox's bylaws. Those decisions and disclosures were clearly material as to Deason's desire to nominate a competing slate of directors to the Board. Thus, defendants' refusal to grant Deason's waiver request is without justification. And, as such, defendants likely breached their fiduciary duty of loyalty by refusing to waive the advance notice bylaw deadline to allow a competing slate of candidates so as to protect and secure their existing Board positions. See Int'l Banknote Co. v. Muller, 713 F. Supp. 612, 626 (S.D.NY 1989) ("The Court also finds that there is a substantial likelihood that the [movant] will succeed at trial in showing that the Board's primary motivation for adopting the By-law was entrenchment."). 
It is undisputed that the transaction at issue was announced after the December 11, 2017 advance notice date. On January 10, 2018, approximately one month after the deadline in the advance notice bylaw, the Wall Street Journal reported rumors of deal talks between Xerox and Fuji. It was not until January 31, 2018, more than six weeks after the director nomination deadline, that Xerox finally disclosed the existence and terms of the potential transaction. On the same day, and for the first time, Xerox decided to disclose copies of the joint venture agreements and their material terms. It is undisputed that the transaction was structured as a strategic transaction that, unlike a merger, deprives the Xerox shareholders of any appraisal rights. It is equally undisputed that extremely material terms of the joint venture arrangements between Fuji and Xerox were first revealed six weeks after the December 11, 2017 advance notice date. Among the provisions of the joint venture agreements that were not disclosed prior to December 11, 2017 is the provision that restricted Xerox from selling more than 30 percent of its equity to a competitor of Fuji without suffering significant economic dislocations. This is tantamount to a "lock up" agreement and is information that, if known by Deason and the shareholders prior to the December 11, 2017 advance notice date, might well have compelled Deason to take steps to challenge the incumbent Board. 
After Deason learned of these material changes in circumstances at Xerox, he sent an open letter to the Board in February 2018 requesting that it waive the December 11, 2017 advance notice deadline for director nominations and reopen the nomination period for him and other shareholders to nominate a full slate of directors for election at the 2018 annual meeting. The Board rejected Deason's request for a waiver of the nomination deadline. Deason thus sought this injunction to achieve what his letter to the Board could not.
"A corporate shareholder who has been wrongfully denied the fundamental right to vote their shares and gain representation on the board of directors is presumed to be threatened with irreparable harm if the corporate electoral process is tainted." Broadway Ass'n v. Park Royal Owners, Inc., No. 123531/01, 2002 WL 34452788 (NY Sup. Ct. Apr. 29, 2002). The nomination process is an integral part of shareholders' right to vote. "As the nominating process circumscribes the range of the choice to be made, it is a fundamental and outcome-determinate step in the election of officeholders. To allow for voting while maintaining a closed candidate selection process thus renders the former an empty exercise." Hubbard, 1991 WL 3151, at *6 (internal quotations omitted). Plaintiff has thus established irreparable harm in the absence of an injunction.
The balance of equities clearly tips in favor of waiving the advance notice bylaw deadline for director nominations. An injunction will enable Deason and any other shareholder to nominate a competing slate of directors who can represent their legitimate interests in determining the future direction of Xerox following a series of decisions and disclosures [*12]regarding a potential change of control transaction with Fuji. Defendants, by contrast, will suffer no cognizable harm if the Court allows for a brief period in which shareholders may nominate competing director candidates for the upcoming 2018 annual meeting.
The law and equitable considerations require that shareholders have the reasonable opportunity to consider nominations in light of the post-deadline, material changes to Xerox's future. The Court therefore grants plaintiff's request for a preliminary injunction waiving the advance notice by-law requirement so as to afford plaintiff Deason, and any other shareholder, the opportunity to nominate a competing slate of candidates to the Board in advance of any vote on the proposed transaction.
CPLR 6312(b) requires the posting of an undertaking in connection with injunctive relief. That section provides in relevant part that "prior to the granting of a preliminary injunction, the plaintiff shall give an undertaking in an amount to be fixed by the court, that the plaintiff, if it is finally determined that he or she was not entitled to an injunction, will pay to the defendant all damages and costs which may be sustained by reason of the injunction " The fixing of the amount of an undertaking is a matter "within the sound discretion of the court, and its determination will not be disturbed absent an improvident exercise of that discretion." Blueberries Gourmet, Inc. v Aris Realty Corp, 255 AD2d 348 (2d Dep't 1998). The sole requirement is that the undertaking must be "rationally related to defendants' potential damages should the preliminary injunction later prove to have been unwarranted." Suttongate Holdings Limited v Laconm Management N.V., et al., 159 AD3d 514 (1st Dep't 2018), quoting Peyton v PWV Acquisition LLC, 101 AD3d 446 (1st Dep't 2012).
Defendants' potential damages here are the loss of the Fuji transaction. The evidence established that transaction potentially has a multi-billion dollar value to Xerox. Therefore, an undertaking in the amount of $150 million is rationally related to the potential damages. Accordingly, plaintiffs' must post an undertaking that totals that amount collectively within five business days of the entry of this decision and order. The Court holds only that plaintiffs have established the requisite for injunctive relief. 
Accordingly, it is hereby
ORDERED that the motions by Plaintiffs in the above-referenced action and in Deason v. Fujifilm, et al., Index No. 650675/18 (mot. seq. no. 001) for injunctive relief are granted to the extent of enjoining Defendants from taking any further action to consummate the change of control transaction between Xerox and Fuji that was announced on January 31, 2018 pending a final determination of the claims asserted in the underlying action; and it is further
ORDERED that the motion by Plaintiffs in Deason v. Xerox Corp., et al., Index. No. 650988/18 (mot. seq. no. 001) for a injunctive relief is granted to the extent of enjoining Defendants from enforcing Xerox's advance notice bylaw provision requiring shareholders to nominate directors for election at the 2018 Xerox annual shareholder meeting by December 11, 2017, and requiring Defendants to waive such advance notice bylaw requirement so that Plaintiff can now notice a slate of directors for election at the 2018 annual meeting.
The injunctions are conditioned on the posting of an undertaking as set forth herein.
Dated: April 27, 2018
____________________________________
Barry R Ostrager, J.S.C.



Footnotes

Footnote 1:The above caption reflects the consolidation of four separate actions commenced against Xerox Corporation, Fujifilm Holdings Corp., and various individuals (see NYSCEF Doc. No. 28). The plaintiffs in those actions were the Asbestos Workers Philadelphia Pension Fund (Index No. 650766/2018), the Iron Workers District Council of Philadelphia & Vicinity Benefit and Pension Plan (Index No. 650795/18), Robert Lowinger (Index No. 650824/18), and the Carpenters Pension Fund of Illinois (Index No. 650841/18). Each plaintiff filed on behalf of itself and "all others similarly situated." Darwin Deason, a major Xerox shareholder, commenced a similar action Deason v Fujifilm, et al. (Index No. 650675/18, known as Deason I) and has moved for injunctive relief similar to that sought by the In Re Xerox plaintiffs in their motion (both designated mot. seq. 001 in the respective actions) to enjoin Defendants "from taking any further action to consummate the change of control transaction between Xerox and Fuji that was announced on January 31, 2018" pending a final determination of the claims asserted in the underlying actions. Additionally, Mr. Deason commenced a second action naming Xerox and the same individuals as defendants but not naming Fuji (Index No. 650988/18, known as Deason II). Plaintiff in Deason II has moved for a preliminary injunction "enjoining Defendants from enforcing Xerox's advance notice bylaw provision requiring shareholders to nominate directors for election at the 2018 Xerox annual shareholder meeting by December 11, 2017, and requiring Defendants to waive such advance notice bylaw requirement so that Plaintiff can now notice a slate of directors for election at the 2018 annual meeting" (mot. seq. 001). The three motions have been consolidated herein for disposition. The Court previously determined certain sealing motions and motions in limine addressed to three of plaintiffs' expert submissions. This decision also serves as the basis to deny the motions to dismiss, at least in part, as the Court has found that plaintiffs have claims against all defendants upon which relief can be granted. To the extent defendants assert that portions of the complaints should be dismissed, the denial of the motions is without prejudice to defendants' filing additional motions to dismiss, particularly in light of the very recent amendment to some of the pleadings. This decision also moots so much of the "class" plaintiffs' motion relating to the timing of the shareholder vote on the transaction.


Footnote 2:Plaintiffs' trial exhibits will be referred to as "PX" and defendants' trial exhibits will be referred to as "DX"

Footnote 3:It is unnecessary to address plaintiffs' claim for common law fraud as all the causes of action seek the injunctive relief that this Court now grants.